# 16-3638

---

# United States Court of Appeals
# for the Seventh Circuit

---

MARK JANUS and BRIAN TRYGG,

*Plaintiffs-Appellants,*

v.

AMERICAN FEDERATION OF STATE COUNTY, AND MUNICIPAL EMPLOY-
EES, COUNCIL 31; GENERAL TEAMSTERS/PROFESSIONAL & TECHNICAL
EMPLOYEES LOCAL UNION NO. 916; and MICHAEL HOFFMAN, in his official
capacity as Director of Illinois Department of Central Management Services,

*Defendants-Appellees,*

LISA MADIGAN, Attorney General of the State of Illinois,

*Intervenor-Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 15-CV-01235
Honorable Robert Gettleman

---

## APPELLANTS' BRIEF AND SHORT APPENDIX

---

William L. Messenger
  *Counsel of Record*
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
(703) 321-8510
wlm@nrtw.org

Jacob H. Huebert
Jeffrey M. Schwab
Liberty Justice Center
190 S. LaSalle Street, Suite 1500
Chicago, Illinois 60603
(312) 263-7668
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org

Dan K. Webb
Lawrence R. Desideri
Joseph J. Torres
WINSTON & STRAWN LLP
35 West Wacker Dr.
Chicago, IL 60601
312.558.5600
312.558.5700 (fax)
dwebb@winston.com
ldesideri@winston.com
jtorres@winston.com


*Attorneys for Appellants*

# DISCLOSURE STATEMENT

1.   The full name of every party that the undersigned attorney represents in the case: Appellants Mark Janus and Brian Trygg.

2.   The name of all law firms whose partners or associates have appeared on behalf of the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this Court: the National Right to Work Legal Defense Foundation, Winston & Strawn LLP, and the Liberty Justice Center.[1]

3.   If the party or amicus is a corporation: not applicable.

/s/ William L. Messenger
William Messenger
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, VA 22160
(703) 321-8510
wlm@nrtw.org

*Appellants' Counsel of Record*

---

[1]  The National Right to Work Legal Defense Foundation and Liberty Justice Center are technically not law firms, but legal aid foundations.

# TABLE OF CONTENTS

P<small>AGE</small>

DISCLOSURE STATEMENT ....................................................................... i

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUE .................................................................. 1

STATEMENT OF THE CASE..................................................................... 1

    A. Illinois' Compulsory Unionism Law For State Employees............................ 1

    B. Proceedings Below................................................................... 2

SUMMARY OF ARGUMENT ..................................................................... 4

ARGUMENT ............................................................................................. 5

    A.  While *Abood* Remains Controlling, Its Reasoning Remains Faulty,
    and Illinois' Compulsory Fee Collection Is Unconstitutional. ............................. 5

    B.  Stare Decisis Cannot Justify Leaving *Abood* in Place. ................................ 14

CONCLUSION........................................................................................ 16

CERTIFICATE OF COMPLIANCE............................................................. 1

CERTIFICATE OF SERVICE.................................................................... 2

# TABLE OF AUTHORITIES

CASES                                                                                          PAGE

*Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) ............................................ passim

*Agostini v. Felton*, 521 U.S. 203 (1997) ............................................................. 14, 16

*Arizona v. Gant*, 556 U.S. 332 (2009) ........................................................................ 15

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ........................................................ 6

*Bromley v. Mich. Educ. Ass'n*, 82 F.3d 686 (6th Cir. 1996) ...................................... 9

*Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986) ....................................... 11

*Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.,* 692 F.3d 580 (7th Cir. 2012) ................. 5

*Citizens United v. F.E.C.*, 558 U.S. 310 (2010) ......................................................... 14

*Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005) ................................................... 9

*Ellis v. Railway Clerks*, 466 U.S. 435 (1984) ............................................................. 9

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................... 6

*Friedrichs v. California Teachers Ass'n*, ___ U.S. ___, 136 S. Ct. 1083 (2016) ........ 3, 5

*Harris v. Quinn*, 134 S. Ct. 2618 (2014) ........................................................... passim

*Int'l Ass'n of Machinists v. Street*, 367 U.S. 740 (1961) .......................................... 11

*John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008) .......................... 14

*Knox v. SEIU, Local 1000*, 132 S. Ct. 2277 (2012) ............................................ passim

*Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991) ............................................ 7, 10

*Miller v. Air Line Pilots Ass'n*, 108 F.3d 1415 (D.C. Cir. 1997) .................................. 9

*Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279 (11th Cir. 2010) ...................... 13

*Payne v. Tennessee*, 501 U.S. 808 (1991) ................................................................. 15

*Railway Employees' v. Hanson*, 351 U.S. 225 (1956) ................................................. 6

## TABLE OF AUTHORITIES (CON'T)

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................................. 6

*Scheffer v. Civil Serv. Empls. Ass'n*, 610 F.3d 782 (2d Cir. 2010) ............................... 9

*Sweeney v. Pence*, 767 F.3d 654 (7th Cir. 2014) ........................................... 13

*Tavernor v. IFT*, 226 F.3d 842 (7th Cir. 2000) ............................................ 9

*UFCW v. NLRB*, 307 F.3d 760 (9th Cir. 2002) ............................................ 9

*United Nurses & Allied Prof'ls (Kent Hosp.)*, 359 NLRB 469 (2012) ........................... 9

*United States v. United Foods*, 533 U.S. 405 (2001) ...................................... 8

STATUTES

5 U.S.C. § 7102 ................................................................... 12

28 U.S.C. § 1291 .................................................................. 1

28 U.S.C. § 1331 .................................................................. 1

28 U.S.C. § 1343 .................................................................. 1

39 U.S.C. § 1209(c) ............................................................... 12

42 U.S.C. § 1983 .................................................................. 1

5 ILCS 315/6(c) ................................................................ 7, 12

5 ILCS 315/6(d) .................................................................. 12

5 ILCS 315/6(e) ................................................................... 2

5 ILCS 315/6(f) ................................................................... 2

5 ILCS 315/7 ..................................................................... 12

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the United States Constitution, and pursuant to 28 U.S.C. § 1343, because relief is sought under 42 U.S.C. § 1983. On October 11, 2016, Plaintiffs-Appellants Mark Janus and Bryan Trygg filed a timely notice of appeal of the district court's September 13, 2016, Dismissal Order and Judgment (Short Appendix ("S.A." 1)) dismissing their Second Amended Complaint ("Compl.") (S.A. 4-20). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUE

This case seeks to have the United States Supreme Court overrule *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) and hold "agency fee" requirements for government employees invalid under the First Amendment to the United States Constitution. The issue presented is whether the Court must affirm the district court's dismissal of Appellants' complaint under *Abood*. Appellants submit that the Court must do so.

# STATEMENT OF THE CASE

## A. Illinois' Compulsory Unionism Law For State Employees.

Appellants are employed by the State of Illinois. Compl., ¶¶ 6-7 (S.A. 5). Mark Janus works for Illinois' Department of Healthcare and Family Services in a bargaining unit exclusively represented by Appellee American Federation of State, County, and Municipal Employees, Council 31 ("AFSCME"). *Id.* at ¶ 6 (S.A. 5). Brian Trygg works for Illinois' Department of Transportation in a unit exclusively rep-

1

resented by Appellee General Teamsters/Professional & Technical Employees Local Union No. 916 ("Teamsters"). *Id*. at ¶ 7 (S.A. 5).

Illinois' Public Labor Relations Act authorizes exclusive representatives to enter into agency fee agreements with the State that require employees, as a condition of their employment, to "pay their proportionate share of the costs of the collective bargaining process, contract administration, and pursuing matters affecting wages, hours and other conditions of employment" to that union. 5 ILCS 315/6(e). The amount of this fee is determined by the union, but "shall not exceed dues uniformly required of members." *Id*. Once entered into, an agency fee agreement continues in effect even after the underlying contract expires. 5 ILCS 315/6(f).

The State is party to agency fee agreements with AFSCME and the Teamsters that require State employees represented by those unions to pay compulsory agency fees. Compl., ¶¶ 21-22, 28 (S.A. 8-9). This includes Janus and Trygg, who had agency fees seized from their paychecks each month. *Id*. at ¶¶ 23-26 (S.A. 9). Janus and Trygg oppose being forced to subsidize AFSCME and the Teamsters because they disagree with the organizations' advocacy. *Id*. at ¶¶ 42-45 (S.A. 12). Trygg also has sincere religious objections to associating with the Teamsters. *Id*. at ¶ 46 (S.A. 13).

**B. Proceedings Below.**

Illinois' agency fee law does not facially violate the First Amendment under *Abood*, which held it constitutional for the government to compel employees to pay agency fees to exclusive representatives for expenses germane to collective bargaining, contract administration, and grievance adjustment. 431 U.S. at 225-26. In 2014, however, the Supreme Court sharply criticized *Abood*'s rationales for uphold-

2

ing agency fees in *Harris v. Quinn*, 134 S. Ct. 2618, 2632-34 (2014), and signaled that the Court may be amenable to overruling *Abood* in a future case.

On February 9, 2015, Illinois Governor Bruce Rauner filed a lawsuit seeking to overrule *Abood*. *See* R. 1 (Rauner Compl.). Governor Rauner sought a declaratory judgment that it is unconstitutional under the First Amendment for the State and several unions, including AFSCME and the Teamsters, to compel State employees to pay agency fees as a condition of their employment. *Id.* at ¶ 97.

On March 10, 2015, Illinois Attorney General Lisa Madigan was allowed to intervene in the case as a defendant. R. 53 (Minute Entry). Shortly thereafter, Janus, Trygg, and another state worker moved to intervene as plaintiffs. *See* R. 92 (Mot. to Intervene). The district court granted the motion to file a complaint in intervention and, in the same order, dismissed Governor Rauner from the case due to lack of subject matter jurisdiction and standing. *See* R. 116 (Mem. Op. & Order). This left the state workers as the only plaintiffs in the case.

 On July 8, 2015, the district court stayed the case pending the outcome in *Friedrichs v. California Teachers Ass'n*, ___ U.S. ___, 136 S. Ct. 1083 (2016) which, like the instant case, sought to overrule *Abood* and have agency fees declared unconstitutional. On March 29, 2016, following the death of Justice Scalia, an equally divided Supreme Court affirmed the lower court's dismissal of *Friedrichs*. *Id.* As a result, *Abood* remains a binding precedent.

On July 21, 2016, Janus and Trygg filed a Second Amended Complaint, alleging that it is unconstitutional under the First Amendment to compel them and other

3

public employees to pay agency fees. Compl., ¶ 70 (S.A. 17-18). Defendants moved to dismiss that complaint, and argued, among other things, that because "*Abood* remains valid and binding precedent . . . this Court has no option but to dismiss plaintiffs' complaint for failure to state a claim." R. 147 (Def. Mem. in Supp. of Joint Mot. to Dismiss, 1). In their response, Janus and Trygg submitted that *Abood* was wrongly decided, but nevertheless agreed that the district court had to dismiss their case because *Abood* is controlling. R. 148 (Pls' Resp. to Defs' Mot. to Dismiss, 1-2). On September 13, 2016, the district court granted the motion to dismiss based solely on *Abood*. (S.A. 1-2). This timely appeal follows.

## SUMMARY OF ARGUMENT

Janus and Trygg submit that the Appellees violate their First Amendment rights by forcing them to subsidize their unions' bargaining-related activities, notwithstanding their deeply help opposition to the positions their unions advance in collective bargaining. The Supreme Court in *Knox v. SEIU, Local 1000*, 132 S. Ct. 2277, 2289 (2012) recognized that agency fees impose a "significant impingement on First Amendment rights," to a degree that is "an anomaly" in First Amendment jurisprudence. 132 S. Ct. at 2289-90 (internal quotation marks and citation omitted). The Supreme Court in *Harris* criticized the "questionable foundations" of compulsory public-sector agency fees and catalogued the various ways in which such fees contradict core First Amendment principles. 134 S. Ct. at 2632–34, 2638. Yet, neither *Knox* nor *Harris* overruled *Abood* and related decisions allowing compulsory public-sector agency fees. Consequently, this Court must affirm the district court's dismis-

4

sal of the Second Amended Complaint because *Abood* forecloses Janus and Trygg's claims in this forum.

## ARGUMENT

The district court's dismissal of the Second Amended Complaint is subject to de novo review, in which the complaint's factual allegations must be accepted as true and construed in the Appellants' favor. *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 591 (7th Cir. 2012). As stated above, Janus and Trygg agree with the Appellees' assertion that "*Abood* remains valid and binding precedent, and this Court has no option but to dismiss plaintiffs' complaint for failure to state a claim." R. 147 (Def. Mem. in Supp. of Joint Mot. to Dismiss, 1). Accordingly, a de novo review must result in affirmance of the district court's decision.

However, in order to avoid any future allegation that Janus and Trygg did not raise or preserve their arguments, the reasons why the Supreme Court should overrule *Abood*, and hold agency fees unconstitutional, are set forth below.

### A. While *Abood* Remains Controlling, Its Reasoning Remains Faulty, and Illinois' Compulsory Fee Collection Is Unconstitutional.

*Abood* was wrongly decided, and should be overruled by the Supreme Court, for the reasons set forth in *Harris*, 134 S. Ct. at 2632–34, *Knox*, 132 S. Ct. at 2289–91, and the reasons argued by the Petitioners and supporting amici in *Friedrichs*, 136 S. Ct. at 1083. *Harris* identified at least seven reasons why *Abood* was wrongly decided. As discussed below, each is persuasive.

*First*, *Harris* criticized *Abood* for not giving "a First Amendment issue of this importance . . . better treatment." 134 S. Ct. at 2632. This is certainly correct, as the

*Abood* majority inexplicably failed to apply to agency fees the exacting constitutional scrutiny that the Supreme Court consistently applies in cases involving compulsory fees and other forms of compelled expressive association. Forced association must serve a "'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Id.* at 2639 (quoting *Knox*, 132 S. Ct. at 2289). Justice Powell recognized this error at the time and criticized the *Abood* majority for failing to apply the requisite constitutional scrutiny. *See* 431 U.S. at 259 (concurring in judgment).

*Abood's* failure to subject agency fees to the proper First Amendment test renders the case an outlier and places *Abood* in conflict with numerous cases in which compulsory fees and other instances of compelled association were required to satisfy exacting scrutiny. *See, e.g.*, *Harris*, 134 S. Ct. at 2639; *Knox*, 132 S. Ct. at 2289-90; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *Elrod v. Burns*, 427 U.S. 347, 362-63 (1976). *Abood* should be overruled for this reason alone.

*Second*, *Harris* found "[t]he *Abood* Court fundamentally misunderstood" the difference between government authorizing compulsory fee arrangements between private parties, which was at issue in *Railway Employees' v. Hanson*, 351 U.S. 225 (1956), and government itself seizing compulsory fees from individuals, which is the situation in the public sector. 134 S. Ct. at 2632. *Abood's* misreading of *Hanson* is legal error intrinsic to the case. Here, Illinois directly seizes agency fees from State employees. Compl., ¶ 34 (S.A. 10-11). *Hanson* has no application here.

*Third*, *Harris* found "*Abood* failed to appreciate" that collective bargaining with government concerns "important political issues." 134 S. Ct. at 2632. The record in this case supports that conclusion. Illinois law provides that union representation extends to bargaining over wages, hours of employment, and other terms and conditions of employment, including health and other benefits. 5 ILCS 315/6(c). These issues—the spending of public dollars and the operation of state government—are all inherently political in nature, and are matters on which individuals may and do have different opinions. Compl., ¶¶ 42–47, 59–63 (S.A. 12-13, 15-16).

*Fourth*, *Harris* recognized the "conceptual difficulty" of distinguishing collective bargaining with government from political advocacy and lobbying, as all are speech "directed at the government." 134 S. Ct. at 2632-33. The Supreme Court has made similar observations on other occasions. *See Knox*, 132 S. Ct. at 2289 (a "public-sector union takes many positions during collective bargaining that have powerful political and civic consequences"); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 520 (1991) (plurality opinion) ("The dual roles of government as employer and policy-maker . . . make the analogy between lobbying and collective bargaining in the public sector a close one."). In fact, this conceptual difficulty was recognized in *Abood* itself, which acknowledged that "[t]here can be no quarrel with the truism that because public employee unions attempt to influence governmental policymaking, their activities . . . may be properly termed political." 431 U.S. at 231; *see also id.* at 256-57 (Powell, J., concurring in judgment) (finding "no principled distinction" between public sector unions and political parties because the objective of both "is to

7

influence public decisionmaking in accordance with the views and perceived interests of its membership"). *Abood*, however, failed to follow this premise to its inevitable conclusion. Given that "[a] State may not force every person who benefits from [a lobbying] group's efforts to make payments to the group," *Harris*, 134 S. Ct. at 2638 (citation omitted), and that bargaining with government is indistinguishable from lobbying, it follows that it is unconstitutional to force employees to support bargaining with government.

The political nature of collective bargaining with the government also dictates that agency fees to support that speech cannot survive constitutional scrutiny, for the Supreme Court has never "upheld compelled subsidies for speech in the context of a program where the principal object is speech itself." *United States v. United Foods*, 533 U.S. 405, 415 (2001). In particular, there is no cognizable interest, let alone a compelling or important one, in preventing employees, or anyone else, from supposedly "free riding" on political advocacy. *See Knox*, 132 S. Ct. at 2289-90. As the Supreme Court has recognized, "free-rider arguments" are "generally insufficient to overcome First Amendment objections." *Id.* at 2289. Moreover, given that Janus, Trygg, and many other employees disagree with their union representatives' advocacy in collective bargaining, *see* Compl. ¶¶ 42-45, they are not free riders at all, but forced riders who are being compelled to subsidize speech with which they disagree.

*Fifth*, *Harris* recognized that "practical administrative problems" exist in distinguishing chargeable from non-chargeable expenses under *Abood*. 134 S. Ct. at 2633.

This conclusion is amply supported by case law. "In the years since *Abood*, the [Supreme] Court has struggled repeatedly with this issue." *Id.* (citing several cases). Lower courts and government agencies have also struggled with this issue. For example, whether and when unions can force nonmember employees to pay for union lobbying[2] and organizing[3] expenses have long been contested issues.

*Sixth*, *Harris* held that "*Abood* . . . did not foresee the practical problems that would face objecting nonmembers," such as determining whether the union properly calculated the agency fee. 134 S. Ct. at 2633. Union failures to provide employees with proper financial notices or procedures that justify their agency fee is a perennial problem. *See, e.g., Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005); *Tavernor v. IFT*, 226 F.3d 842 (7th Cir. 2000). And "[e]mployees who suspect that a union has improperly put certain expenses in the 'germane' category must bear a heavy burden if they wish to challenge the union's actions." *Harris*, 134 S. Ct. at 2633.

---

[2] *Compare Knox,* 132 S. Ct. at 2294-95 (reversing Ninth Circuit decision that unions could charge nonmembers for "lobbying . . . the electorate"), *and Miller v. Air Line Pilots Ass'n*, 108 F.3d 1415, 1422-23 (D.C. Cir. 1997) (holding non-chargeable pilot union's expenses in lobbying federal agencies), *with United Nurses & Allied Prof'ls (Kent Hosp.)*, 359 NLRB 469 (2012) (National Labor Relations Board deems lobbying expenses chargeable to nonmembers if the "specific legislative goal [is] sufficiently related to the union's core representational functions").

[3] *See Ellis v. Railway Clerks*, 466 U.S. 435, 451-53 (1984) (holding it unconstitutional to force employees subject to the Railway Labor Act to pay for union organizing activities); *Scheffer v. Civil Serv. Empls. Ass'n*, 610 F.3d 782, 790-91 (2d Cir. 2010) (reversing district court decision finding union organizing expenses chargeable); *UFCW v. NLRB*, 307 F.3d 760, 769 (9th Cir. 2002) (en banc) (upholding NLRB decision that organizing expenses are partially chargeable to nonmembers); *Bromley v. Mich. Educ. Ass'n*, 82 F.3d 686, 696 (6th Cir. 1996) (holding defensive organizing non-chargeable to employees).

AFSCME's "Notice to All Nonmember Fair Share Fee Payors" illustrates the fifth and sixth infirmities that *Harris* found with *Abood*. The Notice states in part that:

> In addition your Fair Share fee includes your pro rata share of the expenses associated with the following activities which are chargeable *to the extent that* they are germane to collective bargaining, are justified by the government's vital policy interest in labor peace and avoiding free riders, and do not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.
>
> * * *
>
> 18. Paying technicians in labor law, economics, and other subjects for services used in activities *other than* negotiating, implementing, and administering collective bargaining agreements.
>
> 19. Supporting and paying affiliation fees to other labor organizations which *do not* negotiate the collective bargaining agreements governing the fair share payor's employment.
>
> * * *
>
> 22. *Organizing* within the bargaining unit in which fair share fee payors are employed.
>
> 23. *Organizing* other bargaining units.
>
> 24. Seeking to gain representation rights in units not represented by AFSCME.
>
> * * *
>
> 26. *Lobbying* for purposes other than the negotiation, ratification, or implementation of a collective bargaining agreement.
>
> 27. Social and recreational activities.

(S.A. 22) (emphasis added).[4] Janus and other employees have no idea to what degree AFSCME actually charges them for these activities, since AFSCME deems each activity chargeable only "to the extent" that AFSCME believes the expense satisfies a vague three prong test. (S.A. 22). Yet this is the nebulous line that separates the constitutional from the unconstitutional under *Abood*, as that test is derived from *Lehnert*, 500 U.S. at 519. *See Harris*, 134 S. Ct. at 2633 (criticizing the three-prong test because each prong "involves a substantial judgment call.").

---

[4] The Teamsters' agency fee notice utilizes a similar standard. (S.A. 27).

Moreover, the agency fee calculation in the Notice is based on an analysis of union finances in calendar year 2009. (S.A. 22). The Notice was the basis for the agency fee that AFSCME seized from employees in 2011 (*id.*), and for the fees seized from 2014 to present. Compl., ¶36 (S.A. 11). AFSCME is thus basing its agency fee on an audit that it is over 7 years old, and has been using the same calculation for 5 years. This hardly comports with the requirement that a union may calculate the fees "on the basis of its expenses during the preceding year." *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 307 n.18 (1986).

In all, experience has proven Justice Black prophetic in his dissent in *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740 (1961). There, he recognized the futility of trying to separate union bargaining expenses from political expenses: "while the Court's remedy may prove very lucrative to special masters, accountants and lawyers, this formula, with its attendant trial burdens, promises little hope for financial recompense to the individual workers whose First Amendment freedoms have been flagrantly violated." *Id.* at 796.

These problems with administering *Abood* are unresolvable because of the underlying incentives at work. Unions have strong financial incentives to extract the greatest fee possible from nonmembers by pushing the envelope on chargeability. In contrast, employees have little financial incentive to challenge excessive union fees, or burdensome procedures, because the amount of money at stake for each particular employee is comparatively low and the time and expense of litigation is high. *See Harris*, 134 S. Ct. at 2633 (noting "litigating such cases is expensive" and "a heavy

burden" on objecting nonmembers). Given the underlying incentives, unions will inevitably press the limits of any framework that permits the extraction of compulsory fees from nonmembers, leading to endless litigation and continual violations of employees' First Amendment rights.

*Seventh*, *Harris* found that "a critical pillar of the *Abood* Court's analysis rests on an unsupported empirical assumption, namely, that the principle of exclusive representation in the public sector is dependent on a union or agency shop." 134 S. Ct. at 2634; *see also id.* at 2640 ("A union's status as exclusive bargaining agent and the right to collect an agency fee from non-members are not inextricably linked."). Indeed, that empirical assumption on which *Abood* relied was, in fact, false: exclusive representation functions without agency fee requirements in the federal government, 5 U.S.C. § 7102, the postal service, 39 U.S.C. § 1209(c), and the nation's twenty-six right to work states.[5]

Exclusive representation can function without agency fee requirements not only because unions can solicit voluntary support for their activities, just like any other advocacy organization, but because exclusive representation is itself an incredible *benefit* to unions that only *assists* them with recruiting members. Exclusive representation vests a union with legal authority to speak and contract for all employees in a bargaining unit, whether they approve or not. 5 ILCS 315/6(c-d). It also obligates the State to bargain in good faith with that union over certain policies. 5 ILCS 315/7. These legal privileges are extraordinary. Few, if any, other advocacy organi-

---

[5] A list of the nation's twenty-six Right to Work states can be found here: http://www.nrtw.org/rtws.htm.

zations are vested not only with the power to speak for individuals in their relations with the government, but also with the power to force government policymakers to listen and respond to that speech. Unions will seek, and jealously guard, the powers and privileges that come with being an exclusive representative irrespective of whether they can extract compulsory fees from all employees subject to their reign. *Cf. Sweeney v. Pence*, 767 F.3d 654, 666 (7th Cir. 2014) (holding that Indiana's statutory ban on agency fees does not unconstitutionally demand services from a union without just compensation because a union is "fully and adequately compensated by its rights as the sole and exclusive member at the negotiating table.").

The power of exclusive representation also assists unions with recruiting dues-paying members, as employees are far more likely to join and support an organization that has control over their jobs, benefits, and relations with their employer than one that does not have that monopoly. *Abood's* "free rider" and "labor peace" rationales for compulsory fees, which speculate that exclusive representation somehow makes it more difficult for unions to recruit members and financial support, 431 U.S. at 222, turns reality on its head.

For these reasons, and for others,[6] agency fees are not a "'means significantly less restrictive of associational freedoms'" for achieving exclusive representation,

---

[6] Agency fees are also not a least restrictive means because the fees exacerbate the First Amendment injury that exclusive representation inflicts on employee associational rights. *See Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1287 (11th Cir. 2010) (holding that "regardless of whether [an employee] can avoid contributing financial support to or becoming a member of the union . . . its status as his exclusive representative plainly affects his associational rights" because the employee is "thrust unwillingly into an agency relationship"). It is bad enough that the State is forcing Janus, Trygg, and other employees to accept a union as their mandatory

*Harris*, 134 S. Ct. at 2639 (quoting *Knox*, 132 S. Ct. at 2289). Consequently, agency fees fail exacting constitutional scrutiny, and should be deemed unconstitutional by the Supreme Court.

## B. Stare Decisis Cannot Justify Leaving *Abood* in Place.

Stare decisis does not require that the Supreme Court continue to follow *Abood*, notwithstanding its infirmities. *First*, *Abood* eliminates a First Amendment right that simply cannot be erased by stare decisis, which has never been invoked to trump the fundamental rights afforded by the Constitution. Stare decisis "is at its weakest when [the Court] interpret[s] the Constitution." *Agostini v. Felton*, 521 U.S. 203, 235 (1997) (citation omitted). As such, the Supreme Court has "not hesitated to overrule decisions offensive to the First Amendment." *Citizens United v. F.E.C.*, 558 U.S. 310, 363 (2010). As discussed above, *Abood* is offensive to the First Amendment because it permits the government to force individuals to pay for political and ideological speech that is indistinguishable from lobbying.

*Second*, the Supreme Court has recognized stare decisis also must yield where a prior decision creates an anomaly in Supreme Court decisions. *See, e.g., John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008). This is precisely what *Abood* does, as it failed to apply to agency fees the constitutional scrutiny consistently required by the Supreme Court in other cases concerning compulsory fees and compelled expressive association. *See supra* p. 5-6. Indeed, in *Knox*, the Court acknowledged that "acceptance of the free-rider argument as justification for com-

---

agent for petitioning the State. To force the employees to also pay for this unwanted mandatory association is to use one constitutional injury to justify yet another.

14

pelling nonmembers to pay a portion of union dues represents something of an anomaly." *Knox*, 132 S. Ct. at 2290.

*Third*, developments since *Abood* was decided in 1977 have undermined its premise that there is a distinction between public-sector collective bargaining and lobbying. The significant impact that collective bargaining has had on the State of Illinois' dire financial condition alone makes clear that union bargaining with government has political and public policy consequences. *See* Compl., ¶¶ 59–62 (S.A. 15-16).

*Fourth*, there are no reliance interests that justify preserving *Abood*. Invalidating agency fees will not disturb existing collective-bargaining agreements, but would simply enable nonmembers to decline subsidizing Union efforts they reject. And if exaction of agency fees is unconstitutional, which it is, then unions have no valid reliance interests in continuing these unconstitutional exactions. *See Arizona v. Gant*, 556 U.S. 332, 349 (2009) (where "a practice is unlawful, individuals' interest in its discontinuance clearly outweighs any . . . 'entitlement' to its persistence.").

*Fifth*, *Abood* has proven unworkable. *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (noting that stare decisis must yield when a prior decision proves "unworkable"). As set forth *supra*, in divisive decisions post-*Abood*, the Supreme Court (and employees alike) have "struggled repeatedly with" interpreting *Abood* and determining what qualified as a "chargeable" expenditure and what qualified as a "nonchargeable," or political and ideological, expenditure. *Harris*, 134 S. Ct. at 2633 (citations omitted).

While each of the foregoing reasons clearly demonstrates a meritorious argument for modifying or reversing existing law, Appellants recognize that *Abood* is a binding Supreme Court precedent that prevents *this Court* from overruling *Abood*, no matter how flawed the decision may be. Only the Supreme Court can rectify the error it made in *Abood*. *See Agostini*, 521 U.S. at 237 ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## CONCLUSION

Although Janus and Trygg maintain that *Abood* was wrongly decided and should be overturned, it is binding on this Court, which should therefore summarily affirm the district court's dismissal of Janus and Trygg's Second Amended Complaint.

Dated: November 21, 2016

/s/ William L. Messenger
William Messenger
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, VA 22160
(703) 321-8510
wlm@nrtw.org

Dan K. Webb
Lawrence R. Desideri
Joseph J. Torres
WINSTON & STRAWN LLP
35 West Wacker Dr.
Chicago, IL 60601
312.558.5600
312.558.5700 (fax)
dwebb@winston.com
ldesideri@winston.com

16

jtorres@winston.com

Jacob H. Huebert
Jeffrey M. Schwab
Liberty Justice Center
190 S. LaSalle Street, Suite 1500
Chicago, IL 60603
(312) 263-7668
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type limitations provided in Federal Rule of Appellate Procedure 32(a)(7). The foregoing brief was prepared using Microsoft Word 2010 and contains 4,285 words in 12-point proportionately-spaced Century Schoolbook font.

/s/ William L. Messenger
William L. Messenger

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2016, I electronically filed the foregoing Appellants' Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ William L. Messenger
William L. Messenger

*Counsel for Appellants*

# REQUIRED SHORT APPENDIX

## *Contents*

District Court Memorandum Opinion and Order ................................................. S.A. 1

District Court Judgment ........................................................................................ S.A. 3

Second Amended Complaint  ............................................................................... S.A. 4

AFSCME Notice to All Nonmember Fair Share Fee Payors ............................ S.A. 22

Teamster' Notice to Public Fair Share Employees ............................................ S.A. 24

## *Certificate*

Pursuant to Circuit Rule 30(d), I hereby certify that this short appendix includes all the materials required by Circuit Rules 30(a) and (b).


/s/ William L. Messenger
William L. Messenger

*Counsel for Appellants*

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK JANUS and BRIAN TRYGG, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15 C 1235 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| AMERICAN FEDERATION OF STATE, | ) | |
| COUNTY, AND MUNICIPAL EMPLOYEES, | ) | |
| COUNCIL 31; GENERAL TEAMSTERS/ | ) | |
| PROFESSIONAL & TECHNICAL EMPLOYEES | ) | |
| LOCAL UNION NO. 916; MICHAEL HOFFMAN, | ) | |
| Director of the Illinois Department of Central | ) | |
| Management Services, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| LISA MADIGAN, Attorney General of the State | ) | |
| of Illinois, | ) | |
| | ) | |
| Intervenor-Defendant | ) | |

**ORDER**

Plaintiffs Mark Janus and Brian Trygg have brought a second amended complaint

challenging the constitutionality of the compulsory collection of union fees under the Illinois

Public Labor Relations Act ("IPLRA"), 52 ILCS 315/6. Defendants have moved to dismiss,

arguing that the case is controlled by the Supreme Court's decision in Abood v. Detroit Board of

Education, 431 U.S. 209 (1977), which upheld the constitutionality of such assessments.

Plaintiffs brought the suit hoping that Abood would be reversed in a matter then pending before

the Supreme Court in which the continued validity of Abood was challenged. Friedrichs v.

California Teachers Association, __ U.S. __, 136 S.Ct. 1083 (2016). In Friedrichs an equally

divided Supreme Court affirmed the Ninth Circuit's decision upholding fair share fees based on

the reasoning in Abood. Id. As a result, Abood remains valid and binding precedent.

Plaintiffs continue to argue that <u>Abood</u> was wrongly decided, but recognize that it remains controlling in the instant case.  Consequently, defendants' motion to dismiss (Doc. 146) is granted.


**ENTER:**        **September 13, 2016**

**Robert W. Gettleman**
**United States District Judge**

2

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Mark Janus, et al,

Plaintiff(s),

v.

American Federation of State, County, etc.,

Defendant(s).

Case No.  15 C 1235
Judge Robert W. Gettleman

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: defendants' motion to dismiss is granted.

---

This action was *(check one)*:

☐ tried by a jury with Judge          presiding, and the jury has rendered a verdict.
☐ tried by Judge          without a jury and the above decision was reached.
☒ decided by Judge Robert W. Gettleman on a motion

Date:  9/13/2016

Thomas G. Bruton, Clerk of Court

George Schwemin, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

MARK JANUS and BRIAN TRYGG,                    )
                                               )
                Plaintiffs,                    )
                                               )
                v.                              )
                                               )
AMERICAN FEDERATION OF                         )    No. 1:15-CV-01235
STATE, COUNTY, AND MUNICIPAL                   )
EMPLOYEES, COUNCIL 31;  GENERAL                )    Judge Robert W. Gettleman
TEAMSTERS/PROFESSIONAL &                       )
TECHNICAL EMPLOYEES LOCAL                      )    Magistrate Daniel G. Martin
UNION NO. 916; MICHAEL HOFFMAN,                )
Director of the Illinois Department of         )
Central Management Services,                   )
in his official capacity,                      )
                                               )
                Defendants,                    )
                                               )
                                               )
LISA MADIGAN, Attorney General of              )
the State of Illinois,                         )
                                               )
           Intervenor-Defendant.             )

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs, MARK JANUS and BRIAN TRYGG, for their Second Amended Complaint, allege as follows:

1.      Plaintiffs are employed by the State of Illinois.  They are each exclusively represented by one of the Defendant unions (the "Unions"), but they are not members of the Unions.  Plaintiffs are being forced to pay compulsory union fees to the Unions as a condition of their employment pursuant to Illinois' Public Labor Relations Act ("IPLRA"), 5 ILCS 315/6.

2.      Plaintiffs submit that this collection of compulsory fees from them violates their rights under the First Amendment to the United States Constitution.  They seek: (a) a declaratory judgment against the Director of Central Management Services and the Unions (collectively,

"Defendants") to this effect; (b) injunctive relief that prohibits Defendants from seizing compulsory fees from them in the future; and (c) damages from the Unions for compulsory fees wrongfully seized from them.

## JURISDICTION AND VENUE

3.      This is an action under the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to Plaintiffs by the Constitution of the United States, particularly the First and Fourteenth Amendments.

4.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, because they arise under the United States Constitution, and 28 U.S.C. § 1343, because Plaintiffs seek relief under 42 U.S.C. § 1983.  This Court has authority under 28 U.S.C. §§ 2201 and 2202 to grant declaratory relief and other relief based thereon.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district, and because the Unions operate or do business in this judicial district, thus residing in this district for purposes of 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## PARTIES

6.      Plaintiff Mark Janus resides in Sangamon County, Illinois.  He is employed by Illinois' Department of Healthcare and Family Services in a bargaining unit exclusively represented by AFSCME Council 31.  However, Janus is not a member of the Union.

7.      Plaintiff Brian Trygg resides in Edgar County, Illinois.  He is employed by Illinois' Department of Transportation in a bargaining unit exclusively represented by Teamsters Local 916.  However, Trygg is not a member of the Union.

8.      Defendant American Federation of State, County, and Municipal Employees Council 31 ("AFSCME Council 31"), AFL-CIO, is a labor union that exclusively represents over 35,000 public employees in Illinois, and has an office located at 205 N. Michigan Ave., Suite 2100, Chicago, Illinois 60601.

9.      Defendant General Teamsters/Professional & Technical Employees Local Union No. 916 ("Teamsters Local 916") is a labor union that exclusively represents over 2,700 public employees in Illinois, and has an office located at 3361 Teamster Way, Springfield, Illinois 62702.

10.     On information and belief, the Illinois Department of Central Management Services ("CMS"), under the control and direction of its Director, administers programs and services to state agencies.  The Bureau of Personnel within the Department develops and administers the State's Personnel Code, Personnel Rules, Pay Plan, Position Classification Plan, current collective bargaining agreements, and other applicable laws.

11.     CMS is a party to the collective bargaining agreements under which the Plaintiffs pay compulsory union fees.

12.     Defendant Michael Hoffman is the Director of CMS, with an office located at JRTC Suite 4-500, 100 W. Randolph Street, Chicago IL, 60601-3219.

13.     Intervenor-Defendant Lisa Madigan is the Attorney General of the State of Illinois.

## FACTUAL ALLEGATIONS

**I.      Plaintiffs Are Forced to Pay Compulsory Union Fees Pursuant to State Law and Union Contracts.**

14.     Section 6 of IPLRA, 5 ILCS 315/6, grants a designated or recognized union the legal authority to act as "the exclusive representative for the employees of [a bargaining] unit for

3

the purpose of collective bargaining with respect to rates of pay, wages, hours and other conditions of employment not excluded by Section 4 of this Act."  5 ILCS 315/6(c).  These terms and conditions of employment include, among other things, health care coverage, retirement benefits, and pensions.

15.    The mandatory and permissive subjects of collective bargaining under the IPLRA concern matters of political and public concern over which employees and other citizens may have divergent views and opinions.

16.    On information and belief, exclusive representation is not necessary to maintain order and peace amongst employees in public workplaces because, among other things, public employers have other means to ensure workplace discipline.

17.    On information and belief, exclusive representation assists unions with recruiting and retaining members because, among other things: (a) employees are more likely to join and support a union that has authority over their terms of employment, as opposed to a union that does not; (b) exclusive representatives are entitled to information about all employees in the unit; and (c) exclusive representatives can negotiate contract terms that facilitate recruiting and retaining members, such as contract terms providing for union orientations for all employees and automatic deduction of union dues from employees' paychecks.

18.    Under Section 6 of the IPLRA, collective bargaining agreements covered by the IPLRA may require state employees who are not full members of the Unions ("nonmembers") to pay compulsory union fees.  Specifically, Section 6(e) provides that:

> When a collective bargaining agreement is entered into with an exclusive representative, it may include in the agreement a provision requiring employees covered by the agreement who are not members of the organization to pay their proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment, as defined in Section 3(g),

> but not to exceed the amount of dues uniformly required of members. The organization shall certify to the employer the amount constituting each nonmember employee's proportionate share which shall not exceed dues uniformly required of members. In such case, the proportionate share payment in this Section shall be deducted by the employer from the earnings of the nonmember employees and paid to the employee organization.

5 ILCS 315/6(e).  The union fee seizures authorized by § 6(e) of the IPLRA shall hereinafter be referred to as "compulsory fees."

19.    With the exception of the public employer of public employees who are court reporters, "public employer" or "employer" is defined in § 3(o) of the IPLRA Section as:

> the State of Illinois; any political subdivision of the State, unit of local government or school district; authorities including departments, divisions, bureaus, boards, commissions, or other agencies of the foregoing entities; and any person acting within the scope of his or her authority, express or implied, on behalf of those entities in dealing with its employees.

5 ILCS 315/3(o).

20.    CMS, an Illinois state agency within the direction and control of the Governor of Illinois, has entered into collective bargaining agreements under the IPLRA with the Unions that require the deduction of compulsory fees from the earnings of the nonmembers, with the fees then paid to the Unions (hereinafter, "Fair Share Contract Provisions").

21.    CMS was a party to a collective bargaining agreement with AFSCME Council 31 effective from June 30, 2012, to June 30, 2015, which is incorporated by reference herein.[1]  The contract required semi-monthly deduction of compulsory fees from the earnings of nonmember employees.  *Id*. at Art. IV, § 3.

22.    CMS is a party to a collective bargaining agreement with Teamsters Local 916

---

[1]    The document is available at http://www.illinois.gov/cms/Employees/Personnel/ Documents/emp_afscme1.pdf (last visited July 15, 2016), and is attached as Exhibit 1.

effective from June 1, 2015, to June 30, 2019, which is incorporated by reference herein.[2]  The contract requires that compulsory fees be deducted from the earnings of nonmember employees. *Id*. at Art. III, § 1.

23.     Since times before June 30, 2012, Plaintiffs have had compulsory fees deducted from their earnings pursuant to the aforementioned contracts or predecessor contracts.

24.     On information and belief, CMS directly or indirectly made these deductions, acting under the direction and control of Defendant Hoffman or his predecessor Directors at CMS.

25.     Janus currently has $44.58 deducted from his paycheck every month, and estimates that several thousand dollars of compulsory fees have been deducted in total.

26.     Trygg currently has $48.98 deducted from his paycheck every pay period, and estimates that approximately $8,900 of compulsory fees have been deducted in total.

27.     Section 6(f) of the IPLRA requires that "[w]here a collective bargaining agreement is terminated, or continues in effect beyond its scheduled expiration date pending the negotiation of a successor agreement . . . the employer shall continue to honor and abide by any dues deduction or fair share clause contained therein until a new agreement is reached including dues deduction or a fair share clause."  5 ILCS 315/6(f).

28.     Accordingly, Illinois law requires that Plaintiffs continue to pay compulsory fees to AFSCME Council 31 and Teamsters Local 916 after the aforementioned contracts expire.

29.     On information and belief, compulsory fees are not necessary to maintain order or labor peace in the workplace, because, among other reasons, exclusive representation does not depend on the right to collect a fee from non-members.

---

[2]     The document is available at http://www.illinois.gov/cms/Employees/Personnel/ Documents/emp_pt916.pdf (last visited July 15, 2016), and is attached as Exhibit 2.

30.     Even those nonmembers who object to the payment of the compulsory fees because of bona fide religious beliefs may nonetheless "be required to pay an amount equal to their fair share, determined under a lawful fair share agreement, to a nonreligious charitable organization mutually agreed upon by the employees affected and the exclusive bargaining representative to which such employees would otherwise pay such service fee."   5 ILCS 315/6(g).

## II.     Union Fee Calculations and Procedures.

31.     When a union collects compulsory fees from an employee, it must annually provide the employee with a "*Hudson*" notice that, among other things, explains how the union calculated the fee.   *See Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986).   A union calculates a compulsory fee by first defining which types of activities it will deem "chargeable" and "nonchargeable" to nonmember employees, and by then determining what percentage of the union's expenses in a prior fiscal year were chargeable and non-chargeable.   The compulsory fee is set at the prior fiscal year's chargeable percentage.

32.     The above calculation must be based on an audit of union expenditures. However, auditors do not confirm whether the union has properly classified its expenditures as chargeable or non-chargeable.

33.     If a non-member disagrees with a union's classification of expenses as chargeable, the non-member may challenge the classification either through arbitration or in a court of law.

34.     On information and belief, CMS directly deducts compulsory fees, in the amount set by a union, from the earnings of State employees and remits those monies to the union.   The Unions here act under color of state law by causing, participating in, and accepting the

7

compulsory deduction of fees from monies owed to non-member State employees.

35.    On information and belief, rather than sending individual *Hudson* notices to every employee, AFSCME Council 31 posts a "Notice to All Nonmember Fair Share Fee Payors" ("AFSCME Notice") on union bulletin boards in some workplaces.  AFSCME's Notice is attached as Exhibit 3 and is hereby incorporated by reference into this pleading.

36.    On information and belief, the attached AFSCME Notice is the current notice posted by AFSCME Council 31, and is the basis for the compulsory fees it collected in 2014 and through 2015 to date.  Also on information and belief, the attached AFSCME Notice accurately describes AFSCME Council 31's compulsory fees, its calculation thereof, and union's policies related to those fees.

37.    AFSCME states in the AFSCME Notice that, among other uses, its compulsory fees are used for "lobbying for the negotiation, ratification, or implementation of a collective bargaining agreement," "paying technicians in labor law, economics, and other subjects for services used (a) in negotiating and administering collective bargaining agreements; and (b) in processing grievances," "supporting and paying affiliation fees to other labor organizations which do not negotiate the collective bargaining agreements governing the fair share payor's employment," "organizing within the bargaining unit in which fair share fee payors are employed," "organizing other bargaining units," "seeking to gain representation rights in units not represented by AFSCME," and "lobbying for purposes other than the negotiation, ratification, or implementation of a collective bargaining agreement."

38.    On information and belief, AFSCME charges nonmembers compulsory fees equal to approximately 79% of the total dues charged to members.

39.    In February 2016, Teamsters Local 916 mailed to Trygg a "Notice to Public Fair

Share Employees" ("Teamsters Notice"). The Teamsters Notice is attached as Exhibit 4 and is hereby incorporated by reference into this pleading.

40. On information and belief, the attached Teamsters Notice is Teamsters Local 916's current *Hudson* notice and is the basis for the compulsory fees it collected from March 2016 to date. Also on information and belief, the attached Teamsters Notice accurately describes Teamsters Local 916's current compulsory fees, its calculation thereof, and union's policies related to those fees.

41. On information and belief, Teamsters Local 916 charged nonmembers compulsory fees equal to approximately 98% of the total dues charged to members in 2014 and through February 2016. On information and belief, from March 2016 to date, Teamsters Local 916 charges nonmembers compulsory fees equal to approximately 79% of the total dues charged to members.

### III.  Plaintiffs Oppose Being Forced to Pay Compulsory Fees to the Unions.

42. Janus objects to many of the public policy positions that AFSCME advocates, including the positions that AFSCME advocates for in collective bargaining.

43. For example, he does not agree with what he views as the union's one-sided politicking for only its point of view. Janus also believes that AFSCME's behavior in bargaining does not appreciate the current fiscal crises in Illinois and does not reflect his best interests or the interests of Illinois citizens.

44. But for Illinois law requiring compulsory fees, Janus would not pay any fees or otherwise subsidize AFSCME.

45. Trygg objects to many of Teamsters Local 916's public policy positions, including the positions that it advocates for in collective bargaining.

46.     Trygg has sincere religious objections to associating with Teamsters Local 916 and its agenda.  Trygg also believes that Teamsters Local 916 harms Illinois residents by objecting to efforts by the State to reduce costs that would allow public funds to be made available for more important uses.  For example, the Union resists any furlough days, despite the State's budget issues.

47.     But for Illinois law requiring compulsory fees, Trygg would not pay any fees or otherwise subsidize Teamsters Local 916.

48.     On February 9, 2015, Illinois Governor Bruce Rauner issued Executive Order 15-13.  The Executive Order directs CMS and other State agencies to cease enforcement of compulsory fee agreements and to direct all compulsory fee deductions into an escrow account until it is determined if those fees are constitutional.

49.     On information and belief, enforcement of Executive Order 15-13 has been effectively suspended or deferred, with compulsory fees continuing to be deducted (including from the paychecks of Plaintiffs) and remitted to public employee unions.

50.     Under the IPLRA, it is currently permissible for collective bargaining agreements covered by the IPLRA to require nonmembers to pay compulsory union fees.  *See* 5 ILCS 315/6.  The constitutionality of such provisions was first considered by the United States Supreme Court in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977).  In *Abood*, the Supreme Court held the seizure of compulsory fees in the public sector to be constitutional because the fees were justified by state interests in labor peace and avoiding free riders.  However, the *Abood* court failed to subject these ostensible justifications to requisite constitutional scrutiny.

51.     Since *Abood*, the Supreme Court has repeatedly acknowledged that compelling a state employee to financially support a public sector union seriously impinges upon free speech

and association interests protected by the First Amendment of the United States Constitution.

52.    The Supreme Court in *Abood* also distinguished between "chargeable" union expenditures, which may be recouped even from employees who choose not to join a union, and "non-chargeable" expenditures, which can be recouped only from the union's members.

53.    But in the years following the *Abood* decision, the Supreme Court "struggled repeatedly with" interpreting *Abood* and determining what qualified as a "chargeable" expenditure and what qualified as a "non-chargeable," or political and ideological, expenditure. *Harris v. Quinn*, __ U.S. __, 134 S. Ct. 2618, 2633 (2014) (citing *Ellis v. Railway Clerks*, 466 U.S. 435 (1984); *Teachers v. Hudson*, 475 U.S. 292 (1986); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991); *Locke v. Karass*, 555 U.S. 207 (2009)).

54.    In addition, in *Knox v. Service Employees International Union, Local 1000*, __ U.S. __, 132 S. Ct. 2277, 2289 (2012), the Supreme Court also recognized that "a public-sector union takes many positions during collective bargaining that have powerful political and civic consequences."  For that reason, "compulsory fees constitute a form of compelled speech and association that imposes a significant impingement on First Amendment rights."  *Id.* (internal quotation marks omitted).  *Knox* emphasized the "general rule" that "individuals should not be compelled to subsidize private groups or private speech."  *Id.*  "[C]ompulsory subsidies for private speech are subject to exacting First Amendment scrutiny and cannot be sustained unless two criteria are met.  First, there must be a comprehensive regulatory scheme involving a 'mandated association' among those who are required to pay the subsidy."  *Id.* (citation omitted). "Such situations are exceedingly rare because . . . mandatory associations are permissible only when they serve a compelling state interest . . . that cannot be achieved through means significantly less restrictive of associational freedoms."  *Id.* (citation omitted).

55.     "Second, even in the rare case where a mandatory association can be justified, compulsory fees can be levied only insofar as they are a 'necessary incident' of the 'larger regulatory purpose which justified the required association.'" *Id.* (citation omitted).

56.     More recently, in *Harris v. Quinn*, __ U.S. __, 134 S. Ct. 2618 (2014), a majority of the Supreme Court questioned *Abood*'s continued validity on several grounds, and outlined an interpretation of the First Amendment that, in light of the current circumstances of Illinois public sector collective bargaining, is incompatible with nonmembers being compelled to pay compulsory fees such as those required by the Fair Share Contract Provisions.

57.     Regarding the "fair share" provisions at issue in that case, the *Harris* majority noted that "'[t]he primary purpose' of permitting unions to collect fees from nonmembers is 'to prevent nonmembers from free-riding on the union's efforts, sharing the employment benefits obtained by the union's collective bargaining without sharing the costs incurred.'" *Harris*, 134 S. Ct. at 2627 (quoting *Knox*, 132 S. Ct. at 2289).  The Court continued, however, that "'[s]uch free-rider arguments . . . are generally insufficient to overcome First Amendment objections.'" *Harris*, 134 S. Ct. at 2627 (quoting *Knox*, 132 S. Ct. at 2289).

58.     A majority of the Supreme Court also recognized in *Harris* that "fair share" provisions in public employee collective bargaining agreements impose First Amendment concerns not necessarily presented in the private sector, because the collective bargaining process itself is political when taxpayer funds go to pay the negotiated wages and benefits, especially given the great power of unions in electoral politics and the size of public employee payrolls.

59.     On information and belief, in coordination with their express political advocacy, the Unions routinely take positions in the collective-bargaining process that greatly affect the

State's budget.

60.     On information and belief, since *Abood*, the facts and circumstances of Illinois public sector bargaining since its inception in 1984 under the IPLRA have caused the Fair Share Contract Provisions to impose a significant infringement on the First Amendment rights of Illinois state employees who do not wish to become members of the Unions and other public employee unions in Illinois.

61.     On information and belief, when the Unions expend dollars collected pursuant to the Fair Share Contact Provisions to lobby or bargain against reductions to their own benefits packages or to shift more significant reductions to other state programs or services, there is no principled distinction between the Unions and the various special interest groups who must expend money on political activities to protect their own favored programs and services.

62.     On information and belief, Illinois public sector labor costs have imposed and will continue to impose a significant impact on the State's financial condition, clearly demonstrating the degree to which Illinois state employee collective bargaining is an inherently political activity.

63.     Like the petitioners in *Harris*, Plaintiffs have "the right not to be forced to contribute to the union, with which they broadly disagree." *Harris*, 134 S. Ct. at 2640.

64.     The Fair Share Contract Provisions, while permitted by the IPLRA, are nonetheless unconstitutional because they significantly infringe on nonmember Illinois state employees' First Amendment rights, while serving no compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms. Compulsory fees infringe on the First Amendment rights of Plaintiffs and other employees because compulsory fee requirements compel employees to support speech and petitioning against their will, and to

13

associate with a union against their will.

65.     Plaintiffs submit that *Abood* was wrongly decided and should be overturned by the Supreme Court, and that the seizure of compulsory fees is unconstitutional under the First Amendment.  Among other things, there is no justification, much less a compelling one, for mandating that the nonmembers support the Unions, which, on information and belief, are some of the most powerful and politically active organizations in the State.

66.     In addition, the inherently political nature of collective bargaining and its consequences in Illinois has further infringed on nonmembers' First Amendment rights to refrain from supporting public sector unions in their organization and collective bargaining activities. Therefore, the First Amendment forbids coercing any money from the nonmembers to pay fees pursuant to Fair Share Contract Provisions.

67.     In light of these circumstances, these nonmember fee deductions are coerced political speech, in violation of the First Amendment of the United States Constitution.

68.     Under the Supremacy Clause contained in Article VI of the United States Constitution, the First Amendment supersedes any inconsistent purported requirements within Illinois statutes, thus rendering ultra vires any public union collective bargaining agreement provision that would violate nonmembers' First Amendment rights.

## COUNT I

(Compulsory Union Fees Violate 42 U.S.C. § 1983 and the United States Constitution)

69.     Plaintiffs re-allege and incorporate by reference the paragraphs set forth above.

70.     By requiring under color of state law that Plaintiffs pay compulsory fees as a condition of their employment, and by causing such compulsory fees to be withheld from Plaintiffs' wages and remitted to the Unions, CMS under the control and direction of its Director,

AFSCME Council 31, and Teamsters Local 916 are violating Plaintiffs' First Amendment rights to free speech, petitioning, and association, as secured by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

71.    As a result, Plaintiffs are suffering the irreparable harm and injury inherent in a violation of First Amendment rights for which there is no adequate remedy at law.  Unless enjoined by this Court, Plaintiffs will continue to suffer irreparable harm and injury.

72.    The following Illinois laws that authorize compulsory fees are unconstitutional, both on their face and as applied to the Plaintiffs: 5 ILCS 315/3(g), 5 ILCS 315/6(a) (final sentence only), 5 ILCS 315/6(e), 5 ILCS 315/6(f), 5 ILCS 315/10(a)(2) (final sentence only), and 5 ILCS 315/10(b)(1) (reference to "fair share" only).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Issue a declaratory judgment against the Director of CMS, in his official capacity, AFSCME Council 31, and Teamsters Local 916 that:

1.    it is unconstitutional under the First Amendment, as secured against State infringement by the Fourteenth Amendment and 42 U.S.C. § 1983, to seize or require payment of compulsory fees from Plaintiffs and other public employees;

2.    the following statutory provisions are unconstitutional under the First Amendment, as secured against State infringement by the Fourteenth Amendment and 42 U.S.C. § 1983, and null, and void: 5 ILCS 315/3(g), 315/6(a) (final sentence only), 5 ILCS 315/6(e), 5 ILCS 315/6(f), 5 ILCS 315/10(a)(2) (final sentence only), and 5 ILCS 315/10(b)(1) (reference to

"fair share" only).

3.      The sections of AFSCME Council 31's and Teamsters Local 916's contracts with the State that require the seizure of compulsory fees are unconstitutional under the First Amendment, as secured against State infringement by the Fourteenth Amendment and 42 U.S.C. § 1983, and are null and void.

B.      Issue preliminary and permanent injunctions against the Director of CMS, in his official capacity, AFSCME Council 31, and Teamsters Local 916 that prohibit the parties from seizing compulsory fees from Plaintiffs or otherwise requiring that they pay compulsory fees to a union as a condition of their employment.

C.      Award Plaintiff Mark Janus nominal and compensatory damages from AFSCME Council 31, and award Plaintiff Brian Trygg nominal and compensatory damages from Teamsters Local 916, for all compulsory fees seized from them under color of state law from the beginning of the applicable statute of limitations to the date of the said award.

D.      Pursuant to 42 U.S.C. § 1988, award Plaintiffs their costs, including reasonable attorneys' fees incurred in the litigation of this case.

E.      Order any other legal or equitable relief deemed just and proper.


Dated: July 21, 2016

                                        Respectfully submitted,

                                        MARK JANUS and BRIAN TRYGG


                                        By:      ____/s/ Joseph J. Torres_____
                                                 One of Their Attorneys

16

Dan K. Webb
Lawrence R. Desideri
Joseph J. Torres
Brook R. Long
WINSTON & STRAWN LLP
35 West Wacker Dr.
Chicago, IL 60601
312.558.7334
312.558.5700 (fax)
dwebb@winston.com
ldesideri@winston.com
jtorres@winston.com
blong@winston.com

William L. Messenger
Aaron B. Solem (*pro hac vice*)
NATIONAL RIGHT TO WORK LEGAL
DEFENSE FOUNDATION
8001 Braddock Rd., Suite 600
Springfield, VA 22160
703.321.8510
703.321.9319 (fax)
wlm@nrtw.org
abs@nrtw.org

Jacob H. Huebert
Jeffrey M. Schwab
LIBERTY JUSTICE CENTER
190 S. LaSalle St., Suite 1500
Chicago, IL 60603
312.263.7668
312.263.7702 (fax)
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org

17

### <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney states that on the 21st day of July, 2016, he caused a true and correct copy of the foregoing Plaintiffs' Second Amended Complaint to be electronically filed with the Clerk of the Court using the CM/ECF system, to which all parties' counsel of record are registered users.

By:       /s/ Joseph J. Torres
One of Plaintiffs' Attorneys

Joseph J. Torres
WINSTON & STRAWN LLP
35 West Wacker Dr.
Chicago, IL 60601
312.558.7334
312.558.5700 (fax)
jtorres@winston.com

# NOTICE TO ALL NONMEMBER FAIR SHARE FEE PAYORS

This Notice is being provided to all individuals who pay agency fees or fair share fees to Council 31 of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") under collective bargaining agreements between AFSCME Council 31 and various public employers in the State of Illinois. Such Notice is required by the decision of the United States Supreme Court in *Chicago Teachers Union, Local No. 1, AFT, AFL-CIO, et al. v. Hudson, et. al.* PLEASE READ THIS NOTICE CAREFULLY. IT CONTAINS IMPORTANT INFORMATION AND PROCEDURES CONCERNING YOUR LEGAL RIGHTS.

## THE AFSCME COUNCIL 31 FAIR SHARE FEE

As a fair share payor, you are being charged a fair share fee which is equal to your proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and other conditions of employment. The charge is authorized by the Illinois Public Labor Relations Act. The U.S. Supreme Court has held that assessment of a fair share fee equal to a non-member's proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and other conditions of employment is constitutional.

The Fair Share fee includes your pro rata share of the costs of the following activities of AFSCME International, AFSCME Council 31 and its affiliated local unions:

1. Gathering information in preparation for the negotiation of collective bargaining agreements.
2. Gathering information from employees concerning collective bargaining agreements.
3. Negotiating collective bargaining agreements.
4. Administration of ballot procedures on the ratification of negotiated agreements.
5. The public advertising of AFSCME's positions on the negotiation, ratification, or implementation of collective bargaining agreements.
6. Lobbying for the negotiation, ratification or implementation of a collective bargaining agreement.
7. Adjusting grievances pursuant to the provisions of collective bargaining agreements, enforcing collective bargaining agreements, and representing employees in proceedings under civil service laws or regulations.
8. Purchasing books, reports, and advance sheets used in (a) negotiating and administering collective bargaining agreements, and (b) processing grievances.
9. Paying technicians in labor law, economics and other subjects for services used (a) in negotiating and administering collective bargaining agreements, and (b) in processing grievances.
10. Defending AFSCME against efforts by other unions or organizing committees to gain representation rights in units represented by AFSCME.
11. Proceedings regarding jurisdictional controversies under the AFL-CIO constitution.
12. Membership meetings and conventions held at least in part to determine the positions of employees on collective bargaining issues, contract administration and other matters affecting wages, hours and working conditions, including the cost of sending representatives to such meetings and conventions.
13. Internal communications which concern collective bargaining issues, contract administration, public employment generally, employee development, unemployment, job opportunities, award programs and other matters affecting wages, hours and working conditions.
14. Impasse procedures, including fact finding, mediation, arbitration, strikes, slow-downs, and work stoppages, over provisions of collective bargaining agreements and the administration thereof, so long as they are legal under state law. These costs may include preparation for strikes, slow-downs, and work stoppages regardless of their legality under state law, so long as no illegal conduct actually occurs.
15. The prosecution or defense of arbitration, litigation or charges to obtain ratification, interpretation, implementation or enforcement of collective bargaining agreements and any other litigation before agencies or in the courts which concerns bargaining unit employees which is normally conducted by an exclusive representative.

In addition your Fair Share fee includes your pro rata share of the expenses associated with the following activities which are chargeable to the extent that they are germane to collective bargaining activity, are justified by the government's vital policy interest in labor peace and avoiding free-riders, and do not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.

16. Services provided by a parent organization to other bargaining units, which are provided from a pool of resources available to all units, and may ultimately inure to the benefit of the members of the local bargaining unit.
17. Purchasing books, reports, and advance sheets used in activities or for purposes other than negotiating collective bargaining agreements and processing grievances.
18. Paying technicians in labor law, economics and other subjects for services used in activities other than negotiating, implementing and administering collective bargaining agreements and processing grievances.
19. Supporting and paying affiliation fees to other labor organizations which do not negotiate the collective bargaining agreements governing the fair share fee payor's employment.
20. Membership meetings and conventions held for purposes other than to determine the positions of employees on collective bargaining issues, contract grievance adjustment or other matters affecting wages, hours and working conditions.
21. Internal communications which concern subjects other than collective bargaining issues, contract administration, public employment generally, employment development, unemployment, job opportunities, award programs, or other matters affecting wages, hours and working conditions.
22. Organizing within the bargaining unit in which fair share fee payors are employed.
23. Organizing other bargaining units.
24. Seeking to gain representation rights in units not represented by AFSCME, including units where there is an existing designated representative.
25. Prosecution or defense of arbitration, litigation or charges involving matters other than ratification, interpretation, implementation or enforcement of collective bargaining agreements, or which relates to the maintenance of the union's associational or corporate existence.
26. Lobbying for purposes other than the negotiation, ratification or implementation of a collective bargaining agreement.
27. Social and recreational activities.
28. Payments for insurance, medical care, retirement, disability, death, and related benefit plans for union employees, staff and officers.
29. Administrative activities and expenses allocable to AFSCME's activities and expenses for which fair share fee payors are charged.

The Fair Share fee does not include any expenses for the following activities:

30. Training in voter registration, get-out-the-vote, and political campaign techniques.
31. Supporting and contributing to charitable organizations.
32. Supporting and contributing to political organizations and candidates for public office.
33. Supporting and contributing to ideological causes.
34. Supporting and contributing to international affairs.
35. The public advertising of AFSCME's position on issues other than negotiation, ratification, or implementation of collective bargaining agreements.
36. Member-only benefits.

In determining the 2011 fair share fee, the expenditures of AFSCME International, AFSCME Council 31 and its affiliated locals during calendar year 2009 were used in the calculation. Applying the criteria set forth above for determining chargeable and non-chargeable expenditures, the percentage of chargeable expenses for AFSCME International was determined to be 57.53% and for AFSCME Council 31 the percentage of chargeable expenses was determined to be 89.71%. These percentages are based on the audited financial information provided below, which sets forth the major categories of expenditures of AFSCME International and AFSCME Council 31 and states the amount of the expenditures which are chargeable to fair share fee payors.

AFSCME Council 31 has approximately 281 affiliated local unions. The percentage of chargeable expenses for affiliated locals of Council 31 was based upon a review and verification of the financial records of a representative sample consisting of a majority of those locals, including summaries of financial reports, by an independent actuary and was determined to be 75.80%. This percentage is based on the total expenditures of the affiliated locals within the representative sample. Financial information, which sets forth the major categories of expenditures of affiliated locals and states the amount of the expenditures which are chargeable to fair share fee payors, is provided below.

Applying the percentage of chargeable expenditures for AFSCME, AFSCME Council 31 and its affiliated local unions to the revenues collected on behalf of each during calendar year 2009, resulted in a weighted average chargeable fair share percentage of 78.06% that is applicable to non-members. This percentage will remain in effect until the earlier of December 31, 2011 or the issuance of a new Notice.

The following table illustrates the calculation of the chargeable percentage for fair share payors.

| Union Level | Total Revenue Collected by AFSCME Council 31 | Chargeable Percentage | Chargeable Fair Share Revenues |
|---|---|---|---|
| AFSCME International | $9,511,908 | 57.53% | $5,471,915 |
| AFSCME Council 31 | 18,357,735 | 89.71% | 16,468,724 |
| AFSCME 31 Affiliated Locals | 8,149,005 | 75.80% | 6,176,946 |
| **TOTALS** | **$36,018,648** | | **$28,117,585** |
| Overall Percentage | | 78.06% | |

### AFSCME Illinois Council 31
### Account Detail
### Fairshare Allocation 2011

| Description | Adjusted Audited Expense* | Administration Expense | Chargeable Expense Excluding Administration |
|---|---|---|---|
| Salaries and benefits | $14,718,708 | $ 403,973 | $11,830,230 |
| Travel and allowance | 1,144,385 | 33,833 | 990,398 |
| Solidarity expenses | 141,053 | – | – |
| Project help | 48,753 | – | 45,211 |
| Depreciation | 525,027 | 525,027 | – |
| Furniture and equipment repairs | 284,635 | 284,635 | – |
| Equipment rental | 22,501 | 19,310 | – |
| Office, printing, supplies and advertising | 148,272 | 4,393 | 127,959 |
| Postage and freight | 373,509 | 6,891 | 268,107 |
| Organizing supplies | 20,409 | – | 10,529 |
| Books and subscriptions | 30,635 | – | 29,324 |
| Rent | 575,707 | 569,509 | – |
| Telephone | 214,820 | 6,617 | 192,721 |
| Utilities | 75,771 | 75,771 | – |
| Conference and meeting space | 428,035 | – | 394,512 |
| Other insurance | 129,442 | 129,442 | – |
| Editorial service | 302,287 | – | 177,061 |
| Legal and accounting | 408,006 | – | 408,006 |
| Charitable and non-political contributions | 151,755 | – | – |
| Outside services | 171,116 | – | 162,829 |
| Miscellaneous | 6,665 | 6,007 | – |
| Real estate taxes | 30,000 | 30,000 | – |
| Grants | 3,000 | – | – |
| Membership fees | 14,058 | – | 7,776 |
| Building repairs and maintenance | 55,980 | 55,980 | – |
| Minor furniture & equipment purchases | 3,427 | 3,427 | – |
| Arbitration | 154,120 | – | 154,120 |
| Convention expense | 268,855 | – | 268,855 |
| Advertising | 164,635 | – | 62,991 |
| **TOTALS** | **$20,615,566** | **$2,154,815** | **$15,130,629** |

Total expense less administrative expense and international grants received     $16,866,867
Total chargeable expenses excluding administrative expenses     $15,130,629
Portion of expenses chargeable     89.71%
Total administration expenses     $2,154,815
Administration portion chargeable     $1,933,084
**TOTAL CHARGEABLE**     $17,063,713
Total Council 31 portion of expenses chargeable to fair share fee payors     89.71%

*The Council 31 calculation was audited by Stone Carlie & Company, L.L.C., Certified Public Accountants. A copy of the audit report is available upon request.

### AFSCME International Financial Information for the Year Ended 12/31/2009

| International Expenses | Total 2009 International Expense* | Allocated Nonchargeable Expense | Total Chargeable Expense |
|---|---|---|---|
| Field services | $43,001,215 | $ 414,615 | $42,586,600 |
| Assistance to affiliates | 18,854,032 | 7,127,899 | 11,726,133 |
| Education | 5,503,928 | (298,307) | 5,802,235 |
| Research | 8,260,676 | 845,064 | 7,415,612 |
| Legislation | 6,509,830 | 5,282,633 | 1,227,197 |
| Political action & PEOPLE | 34,099,310 | 34,130,924 | (31,614) |
| Retirees | 1,569,450 | 113,417 | 1,456,033 |
| Public affairs | 8,265,588 | 3,787,007 | 4,478,581 |
| President's office | 2,459,435 | 664,960 | 1,794,475 |
| Inter-Union affiliations | 20,246,124 | 20,238,224 | 7,900 |
| International relations | 609,089 | 609,089 | – |
| General counsel | 2,802,806 | 324,437 | 2,478,369 |
| Executive board | 989,847 | – | 989,847 |
| Human resources | 1,141,394 | 308,176 | 833,218 |
| Secretary-Treasurer's office | 1,218,342 | 328,952 | 889,390 |
| Auditing | 12,957,163 | 3,498,434 | 9,458,729 |
| Information systems | 6,715,011 | 1,813,053 | 4,901,958 |
| Judicial panel | 1,040,142 | – | 1,040,142 |
| General operating and building services | 7,823,385 | 5,000 | 7,818,385 |
| Conference and travel services | 1,043,374 | 281,711 | 761,663 |
| **TOTALS** | **$187,120,032** | **$79,475,288** | **$107,644,744** |
| Total Chargeable Expense | $107,644,744 | | |
| Total International Expense | $187,120,032 | ÷ | = 57.53% |

* The International calculation was audited by Bond Beebe, Certified Public Accountants. A copy of the audit report is available upon request.

### AFSCME Council 31
### Local Expenditures
### Fairshare Allocation 2011

| Description | Total Expense* | Nonchargeable Expense | Chargeable Expense |
|---|---|---|---|
| Lobbying | $ 132,376 | $ 126,403 | $ 5,973 |
| Social activities | | | |
| Including fair share | 458,369 | – | 458,369 |
| Excluding fair share | 187,694 | 187,694 | – |
| Newsletter | 60,040 | 33,297 | 26,743 |
| Affiliations | 339,784 | 339,784 | – |
| Political or ideological | 168,541 | 168,541 | – |
| All other | 4,246,872 | 497,922 | 3,748,950 |
| **TOTAL EXPENSE** | **$5,593,676** | **$1,353,641** | **$4,240,035** |
| **CHARGEABLE PORTION** | | | 75.80% |

* The Council 31 calculation was audited by Stone Carlie & Company, L.L.C., Certified Public Accountants. A copy of the audit report is available upon request.

IF YOU WISH TO CHALLENGE THE FAIR SHARE FEE THAT YOU WILL BE REQUIRED TO PAY EFFECTIVE JANUARY 1, 2011, YOU MUST COMPLY WITH THE CHALLENGE PROCEDURE SET FORTH BELOW.

## AFSCME COUNCIL 31 PROCEDURE FOR CHALLENGING THE AMOUNT OF THE FAIR SHARE FEE

AFSCME Council 31 has established the following procedures for individual fair share fee payors who wish to challenge the foregoing calculation and the amount of the AFSCME fair share fee. PLEASE READ THIS PROCEDURE CAREFULLY. YOU MUST COMPLY WITH THESE PROCEDURES IN ORDER TO CHALLENGE THE COUNCIL 31 FAIR SHARE FEE.

### A. Challenges

Fair share fee payors must inform Council 31 of their challenge to the amount of the fair share fee in writing by mail. The written challenge must include the challenging fair share fee payor's ("challenger's") name, address, social security number, job title, employer, employing agency, work location and local affiliation if known.

The written challenge must be received by Council 31 at the following address and be postmarked no later than 30 days from your date of hire or 30 days from transfer into an AFSCME Council 31 bargaining unit position.

Fair Share Challenges
c/o Catherine L. Struzynski
AFSCME Council 31
205 North Michigan Avenue, Suite 2100
Chicago, Illinois 60601

Challengers must file the written challenges on an annual basis. Thus, a written challenge filed to a fair share fee for a previous year will not be considered a challenge to the 2011 fair share fee.

### B. Arbitration Procedure

AFSCME Council 31 has established an Arbitration Procedure for resolving challenges to the amount of the Fair Share Fee. This procedure will result in an expeditious decision on the challenge by an impartial decision maker. The decision maker will be an arbitrator selected by the American Arbitration Association. An arbitration proceeding will be conducted by the arbitrator pursuant to the rules of the American Arbitration Association governing fair share cases. AFSCME will have the burden of proving that the fair share fee is proper. Challengers will have a chance to appear before the arbitrator to state their objections to the fair share fee. The arbitrator will issue a decision regarding challenges to the amount of the fair share fee 90 days after submission of final arguments regarding the amount of the fee. Challengers will receive further information regarding this procedure upon the union's receipt of their challenge.

### C. Escrow of Fair Share Fees

Upon receipt of a written challenge AFSCME Council 31 shall place an amount equal to 100% of the Challenger's fair share fees in an interest bearing escrow account. The fair share fees shall remain in escrow until the arbitration award is issued and shall be distributed to Council 31 and the Challenger pursuant to the arbitrator's ruling.

## RELIGIOUS OBJECTIONS

Fair share fee payors who object to payment of fair share fees because of bonafide religious tenets or teaching of a church or religious body of which said fee payor is a member may pay an amount equal to their fair share fee to a non-religious charitable organization as provided in section 6(g) of the Illinois Public Labor Relations Act. Contact Catherine L. Struzynski at the above address for details concerning this procedure.

# Exhibit 4

GENERAL TEAMSTERS / PROFESSIONAL & TECHNICAL EMPLOYEES
LOCAL UNION NO. 916
AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS
JAMES P. HOFFA, GENERAL PRESIDENT



EXECUTIVE BOARD

TONY BARR,
*PRESIDENT*

DAVID RUSH,
*VICE PRESIDENT*

TOM CLATFELTER,
*SECRETARY TREASURER*

JP FYANS,
*RECORDING SECRETARY*

LEO CARROLL,
*TRUSTEE*

JIM FRANKLIN,
*TRUSTEE*

DAVE SHAFER,
*TRUSTEE*

STAFF

TONY BARR,
*DIRECTING BUSINESS AGENT*

LEO CARROLL,
*EXECUTIVE ASSISTANT*

TOM CLATFELTER,
*BUSINESS AGENT*

DAVID RUSH,
*BUSINESS AGENT*

LARRY LARSON,
*BUSINESS AGENT*

DAVE ROBINSON,
*BUSINESS AGENT*

JP FYANS,
*LEGAL COUNSEL*

TREVOR J. CLATFELTER,
*DIRECTOR*
*GOVERNMENTAL AFFAIRS*

TERESA HANNER,
*ADMINISTRATIVE ASSISTANT/*
*TITAN OPERATOR*

LISA HOWARD,
*ADMINISTRATIVE ASSISTANT/*
*HEALTH & WELFARE AND PENSION*

DODY FILIPIAK,
*BOOKKEEPER*

## **NOTICE TO PUBLIC FAIR SHARE EMPLOYEES**

## **INTRODUCTION**

General Teamsters/Professional & Technical Employees Local Union 916, is the exclusive bargaining Agent for employees in your bargaining unit; **you are a Non-Union Member of the bargaining unit also known as (Fair Share Member).** The Union is allowed to charge you the proportionate share of the costs incurred by the Union as the exclusive representative of the employees in dealing with the Employer.

Union Members are charged two and a half (2 1/2) times their hourly rate of pay rounded to the nearest whole dollar as union dues. Non-union members of the bargaining unit are charged 78.78% of the full member rate as their fair share of the cost of the Union's representation of all unit employees. This fair share charge covers the cost of activities incurred by the Union as the exclusive representative of the employees dealing with the employer. These amounts have been verified by independent auditors as the previous years' expenditures in these categories. Please see attached insert from Kerber, Eck & Braeckel LLP Certified Public Accountants for the union and details on the Fair Share Fee Calculations. These expenditures represent 78.78% of the amount paid by Union members.

The Union will ask the employer to deduct this amount monthly during the term of the current collective bargaining agreement between the Union and the Employer signed and in effect from July 1, 2015 to June 30, 2019.

STATEMENT OF EXPENSES AND ALLOCATION OF EXPENSES
BETWEEN CHARGEABLE EXPENSES AND NON-CHARGEABLE EXPENSES -
PUBLIC SECTOR

# Teamsters Local 916

Proud to be American. Proud to be Teamsters.



December 31, 2014

General Teamsters/Professional & Technical Employees Local Union 916

STATEMENT OF EXPENSES AND ALLOCATION OF EXPENSES BETWEEN CHARGEABLE
AND NON-CHARGEABLE EXPENSES - PUBLIC SECTOR

December 31, 2014

| | Total Expenses | Chargeable Expenses | Non-Chargeable Expenses | Notes |
|---|---|---|---|---|
| Personnel costs | $ 2,131,846 | $ 1,907,683 | $ 224,163 | CI |
| Per capita tax | 987,368 | 647,549 | 339,819 | C3 |
| Donations | 101,590 | | 101,590 | C5 |
| Contract labor | 47,950 | 47,950 | - | C6 |
| Professional fees | 86,449 | 86,449 | - | C6 |
| DRIVE Fund expenses | 47,573 | - | 47,573 | C5 |
| Occupancy | 45,422 | 38,609 | 6,813 | C2 |
| Education and publicity | 29,184 | 9,489 | 19,695 | C2 |
| Protech expenses | 26,230 | 26,230 | - | C6 |
| Member benefits | 38,714 | - | 38,714 | C5 |
| Depreciation | 100,198 | 85,168 | 15,030 | C2 |
| Meetings and travel | 106,427 | 90,288 | 16,139 | C4 |
| Insurance | 40,905 | 34,769 | 6,136 | C2 |
| Repairs and maintenance | 51,100 | 43,435 | 7,665 | C2 |
| Office and administrative expense | 99,516 | 86,665 | 12,851 | C2 |
| Total | $ 3,940,472 | $ 3,104,284 | $ 836,188 | |
| Chargeable/Non-chargeable percentage | | 78.78% | 21.22% | |

The accompanying notes are an integral part of this statement.

5

# TEAMSTERS LOCAL 916

# NOTICE TO ALL PUBLIC SECTOR NON-MEMBER FAIR SHARE FEE PAYERS

This Notice is being provided to all individuals who pay fair share fees to the International Brotherhood of Teamsters ("Teamsters") Local 916 under a collective bargaining agreement between the Teamsters and your employer. Such Notice is required by the decision of the United States Supreme Court in Chicago Teachers Union Local 1 AFL-CIO, et al v. Hudson, et al and Illinois law. **PLEASE READ THIS NOTICE CAREFULLY. IT CONTAINS IMPORTANT INFORMATION AND PROCEDURES REGARDING YOUR LEGAL RIGHTS.**

### TEAMSTER LOCAL 916 FAIR SHARE FEE

As a nonmember fair share fee payer, you are being charged a fair share fee which is equal to your proportionate share of the cost of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment. This charge is authorized by the Illinois Public Labor Relations Act and the Illinois Educational Labor Relations Act. The categories of expenses which are chargeable to fair share fee payers, the categories of nonchargeable expenses and the actual calculation of chargeable and nonchargeable expenses of Teamsters Local 916 are set forth below. Also included in this Notice are descriptions of the procedures by which a nonmember fair share fee payer can challenge the foregoing calculation and the amount of the fair share fee.

### CATEGORIES OF CHARGEABLE AND NON-CHARGEABLE EXPENSES

The fair share fee includes your pro rata share of the costs of the following activities of Teamsters International, Teamsters Joint Council 25 and Teamsters Local 916:

1. Gathering information in preparation for the negotiation of collective bargaining agreements.

2. Gathering information from employees concerning collective bargaining positions.

3. Negotiating collective bargaining agreements.

4. Administration of ballot procedures on the ratification of negotiated agreements.

5. The public advertising of Teamsters' positions on the negotiations, ratification or implementation of collective bargaining agreements.

6. Lobbying for the negotiation, ratification or implementation of a collective bargaining agreement.

7. Adjusting grievances pursuant to the provisions of collective bargaining agreements, enforcing collective bargaining agreements and representing employees in proceedings under civil service laws or regulations.

8. Purchasing books, reports and advance sheets used in negotiating and administering collective bargaining agreements, and processing grievances.

9. Paying technicians in labor law, economics and other subjects for services used in negotiating and administering collective bargaining agreements, and processing grievances.

10. Defending against efforts by other unions or organizing committees to gain representation rights in units represented by Teamsters.

11. Membership meetings and conventions held at least in part to determine the position of employees on collective bargaining issues, contract administration and other matters affecting wages, hours and working conditions, including costs of sending representatives to such meetings and conventions.

12. Internal communications which concern collective bargaining issues, contract administration, public employment generally, employee development, unemployment, job opportunities, award programs and other matters affecting wages, hours and working conditions.

13. Impasse procedures, including fact-finding, mediation, arbitration, strikes, slow-downs and work stoppages, over provisions of collective bargaining agreements and the administration thereof, so long as they are legal under state law. These costs may include preparation for strikes, slow downs, and work stoppages regardless of their legality under state law, so long as no illegal conduct actually occurs.

14. The prosecution or defense of arbitration, litigation or charges to obtain ratification, interpretation, implementation or enforcement of collective bargaining agreements and any other litigation before agencies or in the courts which concern bargaining unit employees which is normally conducted by an exclusive representative.

In addition, your fair share fee includes your pro rata share of the expense associated with the following activities which are chargeable to the extent that they are germane to collective bargaining activity, are justified by the government's vital policy interest in labor peace and avoiding free-riders, and do not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.

15. Services provided by a parent organization to other bargaining units, which are provided from a pool of resources available to all units, and may ultimately inure to the benefit of the members of the local bargaining unit.

16. Purchasing books, reports and advance sheets used in activities or for purposes other than negotiating collective bargaining agreements and processing grievances.

17. Paying technicians in labor law, economics and other subjects for services used in activities other than negotiating, implementing and administering collective bargaining agreements and processing grievances.

18. Supporting and paying affiliation fees to other labor organizations which do not negotiate a collective bargaining agreement governing the fair share fee payer's employment.

19. Membership meetings and conventions held for purposes other than to determine the positions of employees on collective bargaining issues, contract grievance adjustment or other matters affecting wages, hours and working conditions.

20. Internal communications which concern subjects other than collective bargaining issues, contract administration, public employment and generally employee development, unemployment, job opportunities, award programs or other matters affecting wages, hours and working conditions.

21. Prosecution or defense of arbitration, litigation or charges involving matters other than the ratification interpretation, implementation or enforcement of collective bargaining agreement, or which relates to the maintenance of the union's association or corporate existence.

22. Lobbying for purposes other than the negotiations, ratification or implementation of a collective bargaining agreement.

23. Social and recreational activities.

Short Appendix Page 27

24.   Payments for insurance, medical care, retirement, disability, death and related benefit plans for union employees, staff and officers.

25.   Administrative activities and expenses allocable to Teamsters' activities and expense for which fair share fee payers are charged.

The fair share fee does not include any expense for the following activities:

26.   Training and voter registration, get-out-the-vote, and political campaign techniques.

27.   Supporting and contributing to charitable organizations.

28.   Supporting and contributing to political organizations and candidates for public office.

29.   Supporting and contributing to ideological causes.

30.   Supporting and contributing to international affairs.

31.   The public advertising of Teamsters position on issues other than negotiations, ratification, or implementation of a collective bargaining agreement.

32.   Member-only benefits.

33.   Organizing expenses

### TEAMSTERS FAIR SHARE FEE

Applying these categories of chargeable and nonchargeable expenses to the activities and undertakings of Teamsters International, Teamsters Joint Council 25 and Teamsters Local 916 for the most recent periods for which audited financial expenses are available, it was determined that 78.78% of the expenses of the union were chargeable to fair share fee payers. Applying this percentage to the dues rate charged to Teamsters Local 916 members, which varies depending on whether the employees can strike and other concerns, a fair share fee of 78.78% of the pay of the nonmember fee was established. This fair share fee will be effective for the period beginning 1/1/2016 until 12/31/2016.

The fair share fee is based upon the audited financial information provided below. This financial information sets forth the expenditures for all three entities in major categories of expenditures audited by independent accountants. The schedules detail the portions of total audited expenditures which are chargeable to fair share fee payers.

- Teamsters Local Union No. 916
  Statement of Expenses and Allocation of Expenses
  Between Chargeable and Non-chargeable Expenses
  Modified Cash Basis
  Year Ended December 31, 2014 (Page 4)

- Teamsters Joint Council No. 25
  Statement of Expenses and Allocation of Expenses
  Between Chargeable and Non-chargeable Expenses
  Modified Cash Basis
  Year Ended December 31, 2014 (Page 5)

- International Brotherhood of Teamsters
  Consolidated Statement of Expenses and Allocation of
  Expenses Between Chargeable and Non-chargeable
  Expenses, Revised Calculation
  Year Ended December 31, 2013 (Page 6)

### PROCEDURE FOR CHALLENGING THE FAIR SHARE FEE

Teamsters Local 916 has established the following procedure for individual fair share fee payers who wish to challenge the foregoing calculation and the amount of the fair share fee. **Please Read This Carefully. You Must Comply With These Procedures In Order To Challenge The Fair Share Fee.**

### EMPLOYEES SUBJECT TO THE ILLINOIS PUBLIC LABOR RELATIONS ACT

Individual non-member fair share fee payers who are subject to the Illinois Public Relations Act who wish to challenge the calculation of chargeable expenses and the amount of the fair share fee set forth in this Notice must do so individually and in writing. The written challenge must include the challenger's name, address, social security number, job title, employer, employing agency or department and work location.

The written challenge must be sent to Teamsters Local 916 by mail, post marked no later than 45 days from the date of this notice to the following address:

Fair Share Challenge
c/o J.P. Fyans
Teamsters Local 916
3361 Teamster Way
Springfield, IL 62707

Teamsters 916 has an established an arbitration procedure for resolving challenges to the calculation and the amount of the fair share fee. This procedure will result in an expeditious decision on the challenge by an impartial decision maker. The decision maker will be an arbitrator selected by the American Arbitration Association pursuant to the Rules of the American Arbitration Association governing fair share cases. The union will have the burden of proving that the fair share fee is proper. Challengers will have a chance to appear before the arbitrator to state their objections to the fair share fee. The arbitrator will issue a decision regarding challenges to the calculation and the amount of the fair share fee ninety (90) days after submission of final argument regarding the amount of the fee. Challengers will receive information regarding the procedure upon the union's receipt of their challenge.

### EMPLOYEES SUBJECT TO THE ILLINOIS EDUCATIONAL LABOR RELATIONS ACT

Individual non-member fair share fee payers who are subject to the Illinois Educational Labor Relations Act (IELRA) have the right to object to the amount of the fee by filing an objection with the Illinois Educational Labor Relations Board (IELRB). Under this procedure, an objection must be filed no later than six (6) months after the first payroll deduction of the fair share fee. The objection shall be on a form developed by the IELRB and shall contain the following information: the name, address and telephone number of the employee filing the objection; the name address and telephone number of the exclusive representative; the name address and telephone number of the employer; the amount of the fair share fee certified by the exclusive representative; and the amount disputed by the employee.

The IELRB shall investigate and process all fair share fee objections and shall issue complaints or dismiss objections. Hearings on fair share fee objections shall proceed before an administrative law judge who will render a Recommended Decision and Order. The burden of proof shall be on the exclusive representative. The hearing will commence no later than sixty (60) days after the date of filing and objection. A Recommended Decision and Order shall be issued within sixty (60) days after the close of the record. A Recommended Decision and Order or summary of the Recommended Decision and Order shall be served on all parties to the proceeding. Exceptions may be filed to the Recommended Decision and Order pursuant to the rules and regulations adopted by the IELRB. Further

Information may be obtained from the IELRB at 160 N. LaSalle Street, Suite N400, Chicago, IL 60601.

## ESCROW OF FAIR SHARE FEES

Upon receipt of a written challenge, Teamsters Local 916 will deposit, in an interest bearing escrow account, 100% of the fair share fees paid by the challenger pending resolution of their challenge. The fair share fee shall remain in escrow until the arbitration award or a decision by the IELRB issues and shall be distributed along with accrued interest, pursuant to the arbitrator's ruling and Illinois law.

## RELIGIOUS OBJECTION

Fair share fee payers who object to payment of fair share fees because of bona fide religious tenets or teaching of a church or a religious body of which said fee payer is a member, may pay an amount equal to their fair share fee to a non-religious charitable organization as provided under the Illinois Public Labor Relations Act and the Illinois Educational Labor Relations Act. Contact IELRB or ILRB at the above address or J.P. Fyans at Teamsters Local 916, 3361 Teamster Way Springfield, IL 62707 for details concerning this procedure.

3